RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 07a0174p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

STEVE HENLEY,

> *Petitioner-Appellant,*

No. 03-5891

*v.*

RICKY BELL, Warden, Riverbend Maximum
Security Institution,

> *Respondent-Appellee.*

---

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 98-00672—Robert L. Echols, District Judge.

Argued: November 28, 2006

Decided and Filed: May 15, 2007

Before: SILER, COLE, and COOK, Circuit Judges.

---

## COUNSEL

**ARGUED:** Paul S. Davidson, WALLER, LANSDEN, DORTCH & DAVIS, Nashville, Tennessee, for Appellant. Alice B. Lustre, OFFICE OF THE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee. **ON BRIEF:** Paul S. Davidson, WALLER, LANSDEN, DORTCH & DAVIS, Nashville, Tennessee, Paul R. Bottei, FEDERAL PUBLIC DEFENDER'S OFFICE, Nashville, Tennessee, for Appellant. Alice B. Lustre, OFFICE OF THE ATTORNEY GENERAL, Nashville, Tennessee, for Appellee.

COOK, J., delivered the opinion of the court, in which SILER, J., joined. COLE, J. (pp. 10-14), delivered a separate opinion concurring in part and dissenting in part.

---

## OPINION

---

COOK, Circuit Judge. Petitioner Steve Henley was convicted of two counts of murder and aggravated arson in violation of Tennessee law and was sentenced to death. He filed a petition for habeas corpus that alleged twenty-one errors in the state-court proceedings. The district court denied the petition, but granted a Certificate of Appealability (COA) as to one issue, and we permitted Henley to expand the COA to include five additional claims. For the reasons set forth below, we affirm the judgment of the district court.

1

## I. Background

The Tennessee Supreme Court found the following facts in Henley's direct appeal, *State v. Henley*, 774 S.W.2d 908, 912 (Tenn. 1989):

> In summary the evidence showed that Fred and Edna Stafford lived on Pine Lick Creek Road in Jackson County, just a short distance from the farm, owned by Henley's family, where his grandmother lived. On the day of the Staffords' death Henley had visited his grandmother and obtained some mechanical parts for some work he was doing. Flatt was with him. Earlier in the day they had been driving about, tending to business affairs of Henley's. During that time they had consumed some beer and also had taken some drugs, referred to in the record as Dilaudids. According to Flatt, as they passed the Staffords' residence Henley commented, "there was some people that lived on that road that owed his grandmother or grandfather some money, and they done him wrong, his grandparents wrong years before, and he was going to stop and see about collecting some money off them." Henley let Flatt out of the truck just before he reached his grandmother's house. When he returned five or ten minutes later he had a .22 rifle with him. They stopped fifty or seventy-five yards up the road where Henley loaded some more shells into the rifle. He also filled a plastic jug with gasoline from a five-gallon can he had in the back of the truck. They proceeded on toward the Stafford residence. When they reached there Mr. and Mrs. Stafford were standing on the left-hand side of the road looking at a small bridge where some construction work had recently been done. Henley stopped the truck, jumped out and told them, "I want your money, if you don't give it to me this man in the truck here, he's going to kill me." He then directed them to go to the house. Mr. Stafford said, "Steve, if you want money or something, I got $80, maybe $100, you can have it." He forced them on to the house at gunpoint and told Flatt to bring the .22 rifle as he followed behind them. When they got within 20 or 30 feet of the house he told Flatt to give him the rifle and go back to the truck and get the plastic jug of gasoline. Flatt did as directed. As he reached the porch he saw Henley begin to shoot. He first shot Mr. Stafford then turned and shot Mrs. Stafford a time or two. While she was laying on the floor moaning and groaning he threw the rifle to Flatt, took out his pistol and shot her again with the pistol. He told Flatt to pour out some of the gas. Flatt endeavored to do as he was told and poured out a small amount. When he could not finish Henley took the container of gas from him and finished pouring it out. He then directed Flatt to light it. When Flatt said he could not he struck the match and as the flames went up they ran to the truck.
>
> The house burned to the ground. The bodies of the Staffords were found in the ashes. All that remained of Mr. Stafford's body was part of the right leg and the trunk area. The body of Mrs. Stafford was similarly burned. It was determined that Mr. Stafford died from a gunshot wound to the chest with the bullet passing through his heart. Mrs. Stafford's death was caused by burns and inhalation of noxious gases from the fire. It was the opinion of the medical examiner that Mrs. Stafford lived a minute or longer after the fire began.

In 1986, a Tennessee jury convicted Henley of two counts of first-degree murder and one count of aggravated arson. The jury recommended a death sentence. The trial court sentenced Henley to death for each murder and to twenty years imprisonment for the aggravated arson conviction. The Tennessee Supreme Court affirmed Henley's conviction and sentence on direct appeal. Henley filed a state post-conviction petition in 1990, which the trial court denied. The Tennessee Court of Criminal Appeals concluded that Henley did not receive the effective assistance

of counsel during the sentencing phase of his trial and vacated his death sentence. The Tennessee Supreme Court reversed, over a two-justice dissent, and affirmed the trial court's denial of Henley's petition. *Henley v. State*, 960 S.W.2d 572 (Tenn. 1997). Henley filed a motion to reopen his state post-conviction petition in 1999, and the trial court denied it. The Tennessee Court of Criminal Appeals affirmed this decision.

Henley filed a petition in the district court pursuant to 28 U.S.C. § 2254 in 1998, which alleged twenty-one grounds for relief. The district court denied each claim and dismissed the petition. The district court granted Henley a COA as to whether he procedurally defaulted his claim that his accomplice testified falsely at his trial, but denied him a COA on all other issues. We permitted Henley to expand his COA to include the following five issues: (1) whether women were underrepresented in the selection of the foreperson for Henley's grand jury in violation of his due process rights and his right to a fair cross-section of the community serving on his jury; (2) whether Henley's counsel rendered ineffective assistance during the sentencing phase of trial; (3) whether the trial court improperly instructed the jury that it had to unanimously find any mitigating factors in sentencing Henley; (4) whether the prosecutor improperly appealed to the jury to "send a message" as a reason for sentencing Henley to death; and (5) whether the prosecutor improperly vouched for the testimony of Henley's accomplice, Terry Flatt.

## II. Standard of Review

We review de novo a district court's legal conclusions and mixed questions of law and fact, and we review its factual findings for clear error. *Armstrong v. Morgan*, 372 F.3d 778, 781 (6th Cir. 2004); *Lucas v. O'Dea*, 179 F.3d 412, 416 (6th Cir. 1999). Under the Antiterrorism and Effective Death Penalty Act (AEDPA), a district court shall not grant a habeas petition with respect to any claim that was adjudicated on the merits in the state courts unless the adjudication resulted in a decision that (1) was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court; or (2) was based on an unreasonable determination of the facts in light of the evidence presented to the state courts. 28 U.S.C. § 2254(d).

Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case. *Id.* at 413.

The court may look to lower courts of appeals' decisions, not as binding precedent, but rather to inform the analysis of Supreme Court holdings to determine whether a legal principle had been clearly established by the Supreme Court. *Hill v. Hofbauer*, 337 F.3d 706, 716 (6th Cir. 2003). Finally, the habeas petitioner has the burden of rebutting, by clear and convincing evidence, the presumption that the state court's factual findings were correct. *See* 28 U.S.C. § 2254(e)(1); *McAdoo v. Elo*, 365 F.3d 487, 493–94 (6th Cir. 2004); *Warren v. Smith*, 161 F.3d 358, 360–61 (6th Cir. 1998).

## III. Grand Jury Challenge

Henley claims he is entitled to relief under the Due Process Clause based on the systematic exclusion of women from the position of jury foreperson in Jackson County, Tennessee. He presents evidence that from 1974 to 1994, a woman was never selected to serve as a grand jury foreperson; Henley was indicted in 1985. At this time, the foreperson in Tennessee played an unusually important role because he was selected independently by the judge as a thirteenth member of the

grand jury. *See Campbell v. Louisiana*, 523 U.S. 392, 402 (1998). Thus, the selection of the foreperson affected the grand jury's composition. In *Campbell*, the Supreme Court held that defendants have standing to challenge racial discrimination in the composition of the grand jury used to indict them. Although *Campbell* addresses race alone, Henley contends that this rule extends to gender-based claims as well. In order to raise this claim, however, Henley must first show that he may rely on the rule articulated in *Campbell* under the retroactivity doctrine of *Teague v. Lane*, 489 U.S. 288 (1989), which limits a petitioner's ability to obtain relief based on new rules of criminal procedure announced after his conviction became final. Henley raised this claim before the Tennessee Court of Criminal Appeals in his state petition for post-conviction relief, and the court denied it, finding that Henley could not rely on a retroactive application of *Campbell* under *Teague*. AEDPA directs our inquiry to determine whether the Tennessee Court of Criminal Appeals' conclusion was contrary to or an unreasonable application of clearly established federal law; thus, our question is whether the Tennessee court's application of *Teague* was unreasonable. We hold that it was not.

In making its determination, the state court cited favorably our decision in *Coe v. Bell*, 161 F.3d 320 (6th Cir. 1998), in which we discussed this issue at some length, concluding that *Campbell*'s rule cannot be traced for purposes of retroactivity to either *Peters v. Kiff*, 407 U.S. 493 (1972) (plurality opinion), or *Hobby v. United States*, 468 U.S. 339 (1984). Although *Coe* cannot control our disposition because of the strictures of AEDPA, we find its reasoning helpful.[1] For Henley to succeed, he must show that *Hobby* or *Peters* compelled the result in *Campbell* to such a degree that any conclusion to the contrary would be unreasonable. As *Coe* suggests, however, *Campbell* cannot be traced to *Hobby* or *Peters* so clearly. First, although the *Campbell* Court cited *Peters* approvingly in concluding that a defendant can raise a due process challenge to the exclusion of members of another race from a state grand jury, only three Justices in *Peters* based their decision on both the Constitution and a criminal statute they read to provide defendants this entitlement. *Coe*, 161 F.3d at 353 (citing *Peters*, 407 U.S. at 497–98). The other three Justices in the six-Justice majority concluded that the right stemmed from the statute alone. *Id.* (citing *Peters*, 407 U.S. at 505–07, 511, and *Campbell*, 523 U.S. at 400–01). Thus, because "'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds,' *Peters* cannot be said to stand for the proposition that the constitution gave Peters . . . the ability to raise a due-process challenge to the exclusion of Blacks (or women) from his grand jury." *Id.* (citing *Marks v. United States*, 430 U.S. 188, 193 (1977)). We find this reasoning sound, and Henley cannot show the Tennessee appellate court's decision concluding that *Peters* fails to authorize the instant due process challenge is unreasonable or contrary to clearly established federal law.

As for *Hobby*, the *Campbell* court cited *Hobby* approvingly, but *Hobby* cannot be said to have compelled *Campbell*'s result for retroactivity purposes. As *Coe* explained,

> In *Hobby*, a white male defendant challenged his indictment because he said that the grand jury excluded Blacks and women. Because Hobby's claim had been dismissed as a matter of law, the Supreme Court assumed that the violation had occurred and proceeded to consider if Hobby had any remedy. The Court began by noting that purposeful exclusion of women and Blacks from grand jury service was unconstitutional, without distinguishing between gender and race. In proceeding next to the question of remedy, therefore, the Court seemed to be assuming implicitly

---

[1] Henley's case is distinguishable from *Coe* in that Coe's conviction became final before the Supreme Court issued its decision in *Hobby*; nevertheless, the decision in *Coe* extensively examined the question whether *Hobby* compelled the Court's decision in *Campbell*. Any argument that *Coe* is inapposite because of this distinguishing fact is misplaced as we look to *Coe* only for guidance in determining what law is clearly established. *Hofbauer*, 337 F.3d at 716.

that Hobby had standing to raise his claim, both on gender and racial grounds, though it noted the narrow holding of *Peters*. In the end, the Court decided (for reasons that do not concern us) that Hobby was not entitled to a remedy. The *Campbell* Court read *Hobby* approvingly, as establishing some sort of due-process protection with regard to race (the only issue Campbell pursued), though it left the determination of the bounds of that protection, which it said were "still open," for the lower court to determine on remand.

We do not doubt that *Hobby* and *Campbell* can be read as extending due-process protection to men challenging the exclusion of women, though neither case provided detail on the extent of that protection. The casual manner in which these cases suggest such an extension does not mean, however, that the holdings followed necessarily from "existing precedent." Indeed, the failure of *Hobby* even to mention the gender/standing question paved the way for conclusions such as the one we reached later in *Ford v. Seabold*.

*Id.* at 354 (citations omitted). *Coe* also noted that Justice Marshall issued a dissenting opinion from the denial of certiorari in *Ford v. Kentucky*, 469 U.S. 984, 985–86 (1984), a case decided after *Hobby*, in which he commented that the third-party standing issue was not definitively resolved and that the Court had issued conflicting pronouncements on the issue. *Id.* In sum, *Coe*'s reasoning convinces us that the Tennessee court's conclusion was neither contrary to nor an unreasonable application of *Teague*. Moreover, as *Coe* noted, when we examined this issue in *Ford v. Seabold* we concluded that a defendant did not "have standing to challenge the composition of the grand jury pool under the due process clause." 841 F.2d 677, 688 (6th Cir. 1988). *Seabold* bolsters our conclusion in that it provides a perspective on the state of federal law at a time quite relevant to our determination of this issue: after *Hobby*, but before *Campbell*. *See Hofbauer*, 337 F.3d at 716.

Henley also unpersuasively relies on *Rose v. Mitchell* for the proposition that an "indictment returned by [an] unconstitutionally constituted grand jury [must] be quashed." 443 U.S. 545, 551 (1979). *Rose*, however, concerned an African-American defendant challenging the exclusion of African-Americans from the grand jury and relied on the principle that "[a] criminal defendant 'is entitled to require that the State not deliberately and systematically deny to members of *his* race the right to participate as jurors in the administration of justice.'" *Id.* (quoting *Alexander v. Louisiana*, 405 U.S. 625, 628–29 (1972) (emphasis added)). Even if *Rose* reaches gender, Henley, a male, could only challenge the exclusion of other males from the grand jury. Thus, *Rose* does not alter our conclusion on Henley's due process claim.

Henley also raises a Sixth Amendment fair-cross-section challenge to the foreperson of his grand jury. Regardless of the logical soundness of arguing that one person should represent a fair cross-section of a community, the Supreme Court has never allowed defendants to challenge the composition of their grand juries based on the Sixth Amendment. While some federal courts have permitted a fair-cross-section challenge to a state grand jury, *see, e.g.*, *Murphy v. Johnson*, 205 F.3d 809, 817–19 (5th Cir. 2000); *O'Neal v. Delo*, 44 F.3d 655, 662 (8th Cir. 1995); *Ramseur v. Beyer*, 983 F.2d 1215, 1236–37 (3d Cir. 1992), we may grant Henley relief only if this right was clearly established by the Supreme Court as of 1999, and we hold that it was not.

## IV. Ineffective Assistance of Counsel

Henley argues his counsel's failure to investigate his background and to present mitigating evidence at his sentencing hearing deprived him of his constitutional right to effective assistance. Henley can prevail only if the Tennessee Supreme Court's denial of his ineffective-assistance claim was unreasonable in light of clearly established Supreme Court precedent. Our review is essentially limited to determining whether the Tennessee Supreme Court's decision was contrary to or an

unreasonable application of *Strickland v. Washington*, 466 U.S. 668 (1984). Putting aside questions of counsel's performance, we find nothing unreasonable in the Tennessee Supreme Court's conclusion that Henley was not prejudiced by counsel's alleged errors. Therefore, we reject his ineffective-assistance claim.

Our review of the record confirms that it was not unreasonable for the Tennessee Supreme Court to conclude that no prejudice resulted from counsel's failure to call additional lay witnesses. Henley's grandmother gave a "favorable and detailed description" of Henley. Of course, as the state appellate court pointed out, it is "possible" that the jury might have been hostile toward Henley's grandmother. *Henley v. State*, No. 01C01-9506-CC-00193, 1996 WL 234075, at *11 (Tenn. Crim. App. May 9, 1996). But the other lay witnesses likely would not have painted a better picture in light of "their limited relationship with Henley at the time of the murders" and "their personal knowledge of his drug use at the time of the murders." *See Henley*, 960 S.W.2d at 582. We cannot say that it was unreasonable for the Tennessee Supreme Court to conclude that counsel's failure to call additional lackluster lay witnesses did not prejudice Henley at the mitigation phase.

We similarly reject Henley's argument that the state court unreasonably found no prejudice in counsel's failure to call a psychiatric expert to testify, in counsel's words, that Henley "has learning disabilities and dropped out of school, and was, at the time of the offense, suffering from depression and/or acting out of character." In *Strickland* itself, 466 U.S. at 676, 700, the Supreme Court found no prejudice arising from counsel's failure to call a psychiatric expert to testify that the defendant was "chronically frustrated and depressed" due to his inability to support his family financially. Henley's alleged depression resulting from his bankruptcy is similar enough to that found wanting in *Strickland* that it was not unreasonable to have treated Henley's claim the same way. The rest of the proposed expert testimony is so banal that it was not unreasonable to conclude that there was no "reasonable probability" that it would have affected the outcome of the mitigation phase. *See Strickland*, 466 U.S. at 694 (discussing the "reasonable probability" standard for showing prejudice).

### V. Procedural Default of Due Process Claims

Henley believes that the prosecution gave Flatt favorable parole treatment in exchange for his testimony against Henley. Henley's habeas petition claims that his due process rights were violated when Flatt falsely denied receiving these benefits and the prosecutor let this falsity go uncorrected. He also argues, relatedly, that the prosecution violated his due process rights by withholding evidence of this supposed agreement. Essentially, these arguments present claims under *Brady v. Maryland*, 373 U.S. 83 (1963). Henley pressed neither theory before the state courts, and any attempt to now seek post-conviction relief in the Tennessee courts would be procedurally barred. Tenn. Code Ann. § 40-30-102.

To overcome this procedural default and have these claims heard by a federal court, Henley must establish that (1) he had good cause for failing to raise them before the state courts and (2) he was prejudiced by the default. *See, e.g.*, *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000).[2] A petitioner who has procedurally defaulted a *Brady* claim satisfies the "cause and prejudice" test for overcoming the default by satisfying the second and third prongs of the *Brady* test; that is, by showing that "the reason for his failure to develop facts in state-court proceedings was the State's suppression of the relevant evidence," and that "the suppressed evidence is 'material' for *Brady* purposes." *Banks v. Dretke*, 540 U.S. 668, 691 (2004); *see also Strickler v. Greene*, 527 U.S. 263, 282 (1999).

---

[2] Henley could also overcome the procedural default without establishing "cause and prejudice" if he demonstrated "a sufficient probability that [the] failure to review his federal claim will result in a fundamental miscarriage of justice." *Edwards*, 529 U.S. at 451. We do not think this standard is met here.

Henley cites *Banks* for the proposition that he had little responsibility to inquire into the facts surrounding his *Brady* claims—that is, he "cannot be faulted for not catching a prosecutor in his or her lies or withholding of evidence." This mischaracterizes *Banks*. While *Banks* did reject a rule that "defendants must scavenge for hints of undisclosed *Brady* material," *see id.* at 695, it retained the rule that good "cause" must be based on "events or circumstances 'external to the defense.'" *See id.* at 696 (quoting *Amadeo v. Zant*, 486 U.S. 214, 222 (1988)). That is, Henley still must demonstrate that because of some external impediment over which he had no control, he cannot be expected to have developed his *Brady* claim in state court. But he makes no attempt to do so.

Henley points to the fact that Flatt was considered for early release in 1989 and paroled in 1991—despite disciplinary violations in prison—long before his 25-year sentence had run its term, and earlier than similarly situated offenders tend to be paroled. He also points to various state officials' statements indicating that they supported, or at least did not oppose, Flatt's early release. Even assuming these circumstances suggest a surreptitious deal, Henley never explains why he did not present them in state post-conviction proceedings—which pended more than six years after Flatt's parole release. For these reasons, we hold that Henley has failed to establish "cause" sufficient to excuse the procedural default of his *Brady* claims.

## VI. Prosecutorial Misconduct

Henley raises two prosecutorial misconduct claims: (1) that the prosecutor improperly vouched for a witness during the guilt phase, and (2) that the prosecutor improperly asked the jury to send a message during the sentencing phase. Because the Tennessee Supreme Court considered each of these claims on direct appeal, *Henley*, 774 S.W.2d at 910–11, 913, we must assess whether that court's treatment of these claims was contrary to or an unreasonable application of clearly established Supreme Court precedent.

In *Berger v. United States*, the Supreme Court counseled United States Attorneys "to refrain from improper methods calculated to produce a wrongful conviction." 295 U.S. 78, 88 (1935). *Berger* was, however, decided on direct review where the Court could "broad[ly] exercise [its] supervisory power." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)). At this habeas stage, Henley must show that any prosecutorial misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643.

The Tennessee Supreme Court denied relief to Henley on direct review by holding that any error in the prosecutor's vouching for Flatt was harmless. *Henley*, 774 S.W.2d at 911. In response to a credibility attack by defense counsel, the prosecutor commented, "I thought Flatt made one of the best witnesses I've ever seen." *Id.* The prosecutor also began to comment on the "plea bargain process" but "was interrupted by the objection of defense counsel and he abandoned this line of argument." *Id.* Although the Tennessee Supreme Court analyzed these claims under state law, the absence of prejudice spurred its rejection: the court labeled the first remark "innocuous" and viewed the second as resulting from a tense atmosphere where "the argument was improper on both sides." *Id.*; *see also United States v. Young*, 470 U.S. 1, 13 (1985) (noting that invited error can affect how a court determines an improper remark's effect on the trial as a whole). In *Darden*, the most recent United States Supreme Court precedent available to the Tennessee Supreme Court as it decided *Henley*, the Court assessed the prosecutor's argument as improper, some of it as invited, and on balance, concluded Darden received a fair, if not perfect, trial. 477 U.S. at 182. Based on both the limited nature of the prosecutor's comment in this case, and in light of *Darden* and *Young*, the Tennessee Supreme Court's denial of relief for improper vouching was neither contrary to nor an unreasonable application of Supreme Court precedent.

As for the claim arising from the sentencing hearing, the Tennessee Supreme Court held that the prosecutor's "reference to deterrence . . . is an area into which he may not venture." 774 S.W.2d at 913. That court then held, however, that it was "satisfied that the prosecutor's comments did not affect the jury's sentencing decision." *Id.* In *Caldwell v. Mississippi*, the Supreme Court held that a prosecutor's closing argument violated the Eighth Amendment by improperly referring to automatic appellate review of death sentences. 472 U.S. 320, 336, 340 (1985). The *Caldwell* Court distinguished *Donnelly* both by the nature of the comment and by noting that the trial judge in *Donnelly* gave a curative instruction; in contrast, the trial judge in *Caldwell* openly agreed with the prosecutor's improper remark. *Id.* at 339–40. In light of *Caldwell*, vacatur of Henley's sentence was not required because the trial judge sustained the defense counsel's objection and admonished the prosecutor to discontinue that line of argument. We thus hold that the Tennessee Supreme Court's decision was neither contrary to nor an unreasonable application of *Caldwell* and other United States Supreme Court precedent.

## VII. Jury Instruction

Henley complains that the jury instructions and verdict forms were worded so as to require the jury to unanimously find the existence of a mitigating factor. He attempted to raise this claim in his state post-conviction proceedings, but the state courts (erroneously, it seems) concluded that it had been raised on direct appeal and therefore refused to consider the claim. None of the post-conviction courts ever invoked a procedural bar as to this issue, but none of the state courts adjudicated the claim on its merits, either—in these circumstances, we review de novo. *See Linscott v. Rose*, 436 F.3d 587, 592 (6th Cir. 2006).

The jury must be unanimous in determining that an aggravating factor exists. *See Ring v. Arizona*, 536 U.S. 584 (2002). But a state may not, consistent with the Eighth Amendment, require that the jury be unanimous in determining that a mitigating factor exists. *E.g.*, *McKoy v. North Carolina*, 494 U.S. 433, 443–44 (1990); *Mills v. Maryland*, 486 U.S. 367, 373–75 (1988). In this case, the jury instructions read:

> If the jury unanimously determines that at least one statutory aggravating circumstance . . . [has] been proven by the State beyond a reasonable doubt, and said circumstance . . . [is] not outweighed by any sufficiently substantial mitigating circumstances, the sentence shall be death . . . .

> If the jury unanimously determines that no statutory aggravating circumstance . . . [has] been proved by the State beyond a reasonable doubt, or if the jury unanimously determines that a statutory aggravating circumstance . . . [has] been proven by the state beyond a reasonable doubt, but that said circumstance . . . [is] outweighed by one or more mitigating circumstance, the punishment shall be life imprisonment . . . .

The verdict form for sentencing Henley to death read:

> We, the Jury, unanimously find the following listed statutory aggravating circumstance or circumstances . . . . Secondly, we, the Jury, unanimously find that there are no mitigating circumstances sufficiently substantial to outweigh the statutory aggravating circumstance or circumstances so listed above . . . .

The question here is whether either of these admonitions requires the jury to be unanimous in determining that a mitigating factor exists. *Mills* established that if there is a "substantial possibility" that the answer is yes, the court must remand for resentencing. 486 U.S. at 377. But the plain language of both the instructions and the verdict form require unanimity as to the weighing of aggravating and mitigating circumstances—not the existence of a mitigating circumstance. In other words, these admonitions simply and unobjectionably require a unanimous verdict. We

reviewed identical instructions and verdict forms in *Coe* and concluded the instructions and form required "unanimity as to the results of the *weighing*, but this is a far different matter than requiring unanimity as to the *presence* of a mitigating factor." 161 F.3d at 338. As in *Coe*, "[n]othing in this language could reasonably be taken to require unanimity as to the presence of a mitigating factor. The instructions say clearly and correctly that in order to obtain a *unanimous verdict*, each juror must conclude that the mitigators do not outweigh the aggravators." *Id.* Thus, we hold that the Tennessee court did not require the jury to be unanimous in finding the existence of a mitigating factor, and we affirm the district court's denial of this claim.

## VIII. Conclusion

For the foregoing reasons, we affirm the district court's judgment.

---

### CONCURRING IN PART, DISSENTING IN PART

---

R. GUY COLE, Jr., Circuit Judge, concurring in part and dissenting in part. I agree with the majority's conclusion that (1) the trial court did not improperly instruct the jury that it had to unanimously find any mitigating factors in sentencing Henley; (2) the prosecutor did not improperly appeal to the jury to "send a message" as a reason for sentencing Henley to death; (3) the prosecutor did not improperly vouch for the testimony of Henley's accomplice, Terry Flatt; and (4) Henley procedurally defaulted on his claim that Flatt falsely testified in exchange for an assurance of early release from prison. I write separately because I disagree with the majority's disposition of Henley's due-process challenge to the selection of his grand-jury foreperson and his ineffective-assistance-of-counsel claim.

The majority concludes that Henley's due-process claim, alleging that women were under-represented in the selection of his grand-jury foreperson, fails because *Campbell v. Louisiana*, 523 U.S. 392 (1998), announced a new rule of constitutional law. *Campbell*, however, does not announce a new rule but rather is dictated by the Supreme Court's prior decisions in *Peters v. Kiff*, 407 U.S. 493 (1972) (plurality opinion), and *Hobby v. United States*, 468 U.S. 339 (1984). Moreover, the majority's conclusion that it was not unreasonable for the Tennessee Supreme Court to conclude that Henley was not prejudiced by his trial counsel's deficient performance is incorrect. Henley has shown that his trial counsel's performance was both deficient and prejudicial under *Strickland v. Washington*, 466 U.S. 668 (1984). Accordingly, because I would grant Henley habeas relief on his ineffective-assistance-of-counsel claim and would grant Henley an evidentiary hearing on his due-process challenge, I respectfully dissent.

### A. Due-Process Challenge To The Selection Of Henley's Grand-Jury Foreperson

Henley asserts a due-process challenge to the systematic exclusion of women, in Jackson County, Tennessee, from the position of grand-jury foreperson. The Tennessee Court of Criminal Appeals determined that *Campbell* declared a new rule, and the court therefore concluded that *Teague v. Lane*, 489 U.S. 288 (1989), barred retroactive application of *Campbell* to Henley's claim. Both the Tennessee Court of Criminal Appeals and the majority erred in concluding that *Campbell* declared a new rule.

A conclusion that *Campbell* is dictated by precedent (and therefore does not announce a new rule of constitutional law) is supported by the Supreme Court's prior decisions in *Peters, Hobby*, *Rose v. Mitchell*, 443 U.S. 545 (1979), and *Powers v. Ohio*, 499 U.S. 400 (1991). In the cases leading up to *Campbell*, the Supreme Court repeatedly stressed its concern that discrimination, such as the kind complained of by Henley, hurts all defendants regardless of their race or gender and undermines the fair administration of justice.

In *Peters*, for instance, where a white defendant claimed that his due-process rights were violated because blacks were systematically excluded from both the grand jury that indicted him and the petit jury that convicted him, the Court explained that the exclusion of blacks "from jury service injures not only defendants, but also other members of the excluded class: it denies the class of potential jurors the 'privilege of participating equally . . . in the administration of justice,' and it stigmatizes the whole class . . . by declaring them unfit for jury service and thereby putting 'a brand upon them, affixed by law, an assertion of their inferiority.'" 407 U.S. at 499 (quoting *Strauder v. West Virginia*, 100 U.S. 303, 308 (1880)).

The Court's concern with the integrity of the judicial system was also apparent in its decision in *Rose*. In *Rose*, as in *Peters*, the Court expressed its concern that "[s]election of members of a grand jury because they are of one race and not another destroys the appearance of justice and thereby casts doubt on the integrity of the judicial process." *Rose*, 443 U.S. at 555-56. *Rose* held that two black defendants could bring an equal-protection challenge to their convictions based on racial discrimination in the selection of the Tennessee grand jury and grand-jury foreperson that indicted them for murder. In addressing the harm caused by such discrimination, the Court stated that

> [t]he harm [from discrimination] is not only to the accused, indicted as he is by a jury from which a segment of the community is excluded. It is to society as a whole. *The injury is not limited to the defendant—there is injury to the jury system, to the law as an institution, to the community at large, and to the democratic ideal reflected in the processes of our courts*.

*Id.* (quoting *Ballard v. United States*, 329 U.S. 187, 195 (1946)) (internal quotation marks omitted) (emphasis added).

In *Powers*, the Court held that Powers, a white, male defendant, had standing to raise an equal-protection objection to the prosecutor's allegedly race-based exercise of peremptory challenges to exclude black prospective jurors. 499 U.S. at 402. The Court stated that "[t]o bar petitioner's claim because his race differs from that of the excluded jurors would be to condone the arbitrary exclusion of citizens from the duty, honor, and privilege of jury service." *Id.* at 415. In reaching its conclusion, the Court explained that it was not deviating from past precedent but rather was "once again declin[ing] to reverse a course of decisions of long standing directed against racial discrimination in the administration of justice." *Id.* (quoting *Cassell v. Texas*, 339 U.S. 282, 290 (1950) (Frankfurter, J., concurring in judgment)).

In *Campbell*, the Court reiterated that discrimination based on race "strikes at the fundamental values of our judicial system." 523 U.S. at 398 (quoting *Rose*, 443 U.S. at 556). The Court in *Campbell* concluded that a white, male defendant had standing to object to discrimination against blacks in the selection of his grand jury and grand-jury foreperson. In *Campbell*, the Court again addressed its concern that discrimination in the selection of a grand jury or grand-jury foreperson hinders the fair administration of justice and undermines the integrity of our judicial system—a common thread running through the opinions preceding *Campbell*.

Further, the decision in *Campbell* is dictated by the Supreme Court's decision in *Hobby* and *Peters*—the two cases the Court relied on in addressing Campbell's due-process challenge. In *Peters*, three justices agreed that a defendant, "whatever his race, . . . has standing to challenge the system used to select his grand or petit jury, on the ground that it arbitrarily excludes from service the members of any race, and thereby denies him due process of law." 407 U.S. at 504. In *Hobby*, the Court held that discrimination in the selection of a grand-jury foreperson, when that individual is selected from a properly constituted grand jury, does not violate due process. 468 U.S. at 344. In *Hobby*, unlike in *Campbell*, the duties of the foreperson where only "ministerial." *Id.* Although the Court in *Hobby* assumed without deciding the third-party-standing question[1], the Court in *Campbell* nonetheless stated that its decision in *Hobby* "proceeded on the implied assumption that a white defendant had standing to raise a due process objection to discriminatory appointment of a federal grand-jury foreperson." 523 U.S. at 401. Thus, the holding in *Campbell* is nothing more than a logical extension of the Court's assumption in *Hobby*, and is consistent with the Court's prior

---

[1] In *Hobby*, the Court assumed, but did not decide, that a white, male defendant had standing to challenge discrimination against blacks and women. 468 U.S. at 342 (explaining that "[i]t is only the narrow question of the remedy that we consider").

statements in *Rose*, *Peters*, *Hobby*, and *Powers* regarding the fair administration of justice. When the Court in *Campbell* finally concluded that all defendants, regardless of their race or sex, have standing to challenge discrimination against any individual in the selection of their grand or petit jury, the Court did not break new ground. Because *Campbell* is nothing more than an extension of the Court's prior precedents, *Teague* does not bar its retroactive application.

The majority relies on our prior decision in *Coe v. Bell*, 161 F.3d 320 (6th Cir. 1998), to support its conclusion that *Campbell* was not dictated by precedent. In *Coe*, however, we did not address whether *Campbell* declared a new rule because we were not required to do so to dispose of *Coe*'s due-process claim. Coe's conviction was final in 1984, before the Supreme Court's decision in *Hobby*, *Powers*, and *Campbell*. *Coe*, 161 F.3d at 328. We concluded that Coe did not have third-party standing to bring his due-process claim because we declared that *Hobby*, decided after Coe's conviction became final, declared a new rule. *Id.* at 354. Moreover, statements we made in *Coe* suggest that *Campbell* did not announce a new rule. In *Coe*, we stated that "[t]he *Campbell* Court read *Hobby* approvingly, as establishing some sort of due-process protection with regard to race." 161 F.3d at 354. We also stated that "[w]e do not doubt that *Hobby* and *Campbell* can be read as extending due-process protection to men challenging the exclusion of women." *Id.* These statements support a conclusion that, at a minimum, the Court's decision in *Campbell* was dictated by *Hobby*.

Further support for the conclusion that *Campbell* does not announce a new rule is found in the Fifth Circuit's decision in *Peterson v. Cain*, 302 F.3d 508 (5th Cir. 2002)—the only other circuit to have addressed whether *Campbell* announced a new rule. Carter Paul Peterson's conviction and sentence became final in 1982. After the Supreme Court's decision in *Campbell*, Peterson sought habeas review in federal court, claiming that the selection process for his grand-jury foreperson in Lafayette Parish, Louisiana, violated his constitutional due-process and equal-protection rights because the process systematically excluded blacks. The *Peterson* court concluded that the equal-protection portion of *Campbell*'s holding was dictated by the Supreme Court's earlier decisions in *Powers* and *Rose*. *Id.* at 512. According to the Fifth Circuit, "[t]here is no leap in logic nor a significant difference between *Powers* and *Rose v. Mitchell* to *Campbell*." *Id.* at 513. The *Peterson* court explained that in *Campbell*

> [o]nce again, the Court's concern is focused on the integrity of the judicial process in the selection of a grand jury foreperson. By applying rules established in prior cases, the Court conducted precisely the same analysis founded in maintaining judicial integrity as in *Powers*.

*Id.*

The Fifth Circuit also concluded that the due-process portion of *Campbell* was dictated by precedent, reasoning that the Court in *Campbell* only elaborated on the implied assumption the Court made in *Hobby*. Specifically, the Fifth Circuit noted that in *Campbell*

> the foreperson was selected not merely to conduct ministerial duties, but was also selected to act as a voting member of the grand jury, a vote that directly impacted the defendant. To the extent that such a selection was made discriminatorily, it ran afoul of the *Hobby* implied assumption of due process. The Court's decision in *Campbell* was therefore dictated by its opinion in *Hobby*.

*Id.* 513-514. In *Peterson*, the Fifth Circuit did not overlook our decision in *Coe*. The court noted that this Court "did address the subject [of *Campbell*] . . . but did not resolve whether *Campbell* stood for a new rule, under either equal protection or due process prongs." *Id.* at 512 n.3. Further, the Fifth Circuit, in a later unpublished decision, reiterated that the Supreme Court's decision in

*Campbell* was dictated by the Supreme Court's earlier decisions in *Powers*, *Rose*, *Hobby*, and *Peters*. *See Crandell v. Warden, Louisiana State Penitentiary*, 72 Fed. App'x. 48, 49 (5th Cir. July 11, 2003).

Accordingly, because *Campbell* did not announce a new rule of constitutional law, but rather was dictated by prior Supreme Court precedent, *Campbell* can be retroactively applied to Henley's claim. As a result, the Tennessee Supreme Court's decision, that Henley lacks standing to bring his due-process claim, is an unreasonable application of *Teague*. Thus, Henley is entitled to an evidentiary hearing to determine whether his claim, that women where under-represented in the selection of his grand-jury foreperson in Jackson County, Tennessee, from 1974 to 1994, is valid.

## B.  Ineffective Assistance of Counsel

The majority also concludes that the Tennessee Supreme Court did not unreasonably apply *Strickland* when it held that counsel's alleged errors during the sentencing phase did not prejudice Henley. I disagree and would grant Henley habeas relief on this claim.

I am not alone in my conclusion that Henley's counsel at sentencing was constitutionally deficient: Three judges on the Tennessee Court of Criminal Appeals and two judges on the Tennessee Supreme Court also reached the same conclusion. *See Henley v. Tennessee*, No. 01C01-9506-CC-00193, 1996 Tenn. Crim. App. LEXIS 293, at *31-36 (May 9, 1996); *Henley v. Tennessee*, 960 S.W.2d 572 (Tenn. 1997) (Reid, J. & Birch, J., dissenting). At Henley's post-conviction hearing, Henley presented evidence that although several of his family members would have testified on his behalf at his sentencing hearing, his trial counsel failed to speak to any of them about such a possibility. *Henley*, 1996 Tenn. Crim. App. LEXIS 293, at *32; *see also Henley*, 960 S.W.2d at 576-77. The Tennessee Court of Criminal Appeals noted that "[n]o psychological or psychiatric evaluation was done on Henley . . . . There is no evidence from [Henley's attorney's] file or otherwise that he investigated Henley's educational background, employment history, or that he spoke with members of the community familiar with Henley." *Henley*, 1996 Tenn. Crim. App. LEXIS 293, at *35. Further, the evidence that Henley's attorney did provide at the sentencing hearing was minimal: only Henley and his grandmother, who had already testified at trial, testified in mitigation.

The Supreme Court in *Strickland* explained that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." 466 U.S. at 691. In a capital case, an attorney has a duty to speak to the defendant's family about the defendant's background and about the possibility of them testifying at the sentencing hearing. *See Wiggins*, 539 U.S. at 524 (explaining that in a capital case trial counsel must undertake "to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor") (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C) (1989)); *Strickland*, 466 U.S. at 691 (noting that "counsel has a duty to make reasonable investigations"). Moreover, had Henley's counsel conducted a proper investigation into Henley's background, it may have revealed other mitigating evidence that could have persuaded just a single juror to sentence Henley to life in prison as opposed to death. Because there is no evidence that Henley's attorney investigated Henley's background or spoke to his family members about testifying at Henley's sentencing hearing, despite their willingness to do so, the performance of Henley's attorney fell below the standard for "professionally competent assistance" required by *Strickland*. 466 U.S. at 690.

Further, trial counsel's failure to call Henley's family members to testify coupled with Henley's mother's refusal to testify were prejudicial. At Henley's sentencing hearing, Henley's trial counsel attempted to call Henley's mother as a witness. After being called, Mrs. Henley first asked to speak to Henley's attorney. After a brief recess, Mrs. Henley did not testify and Henley's

attorney instead called Henley's grandmother to the stand. At his post-conviction hearing, Henley argued that he was prejudiced because the jurors saw his mother's refusal to testify. According to Mrs. Henley, she refused to testify at the sentencing hearing because Henley's attorney had not contacted her about testifying and she did not understand the purpose for her testimony or what she was expected to say. Mrs. Henley did explain that had she been properly prepared she would have testified and her testimony would have been positive. *Henley*, 960 S.W.2d, at 576. Specifically, Mrs. Henley would have testified "about her son's life, her love for him, and her belief that he would not have committed the crimes 'if he was at his right mind.'" *Id.*

The Tennessee Court of Criminal Appeals concluded that Henley's evidence established prejudice resulting from his counsel's deficient performance: "We do not think it is assuming too much to conclude that a jury is going to be prejudiced against a defendant upon that person's own mother refusing to testify on his . . . behalf." *Henley*, 1996 Tenn. Crim. App. LEXIS 293, at *32. Because of the special relationship between a mother and child, not having one's own mother testify on their behalf, when one's life is at stake, would surely affect a juror's decision. As to the testimony of Henley's other family members, the Tennessee Supreme Court concluded that the testimony was weaker than the grandmother's testimony, because of their limited relationship with Henley, and cumulative of the grandmother's testimony, because Henley's other family members would have provided no new insight into Henley's life. However, having multiple family members plead for a defendant's life humanizes the defendant and makes it more likely that at least one juror will spare his life. *See generally Hardwick v. Crosby*, 320 F.3d 1127, 1163 (11th Cir. 2003) (explaining that a defendant's attorney must conduct a proper investigation to "find witnesses to help humanize the defendant, given that a jury has found him guilty of a capital offense"); *Mayes v. Gibson*, 210 F.3d 1284, 1288 (10th Cir. 2000) (noting that "mitigation evidence affords an opportunity to humanize and explain"). In this context, where the defendant is charged with a heinous crime, positive cumulative testimony benefits the defendant because the testimony of several family members all pleading for the defendant's life has a greater impact on the jury than the testimony of a single individual, regardless of how favorable that person's testimony is. Thus, had Henley's trial counsel not been deficient, "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Accordingly, because the Tennessee Supreme Court unreasonably applied *Strickland*, I would grant Henley habeas relief on this claim.