NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0163n.06

**No. 10-1903**

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

**Feb 08, 2012**

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| MICHAEL DENNIS BATEY, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| DEBRA SCUTT, Warden, | ) | DISTRICT OF MICHIGAN |
| | ) | |
| Respondent-Appellant. | ) | |
| | ) | |

BEFORE: SUHRHEINRICH, SUTTON and COOK, Circuit Judges.

**SUHRHEINRICH, Circuit Judge.** The State of Michigan appeals the district court's grant of Petitioner-Appellee Michael Batey's petition for writ of habeas corpus following his conviction for first-degree criminal sexual conduct under Michigan law. We **REVERSE** and **REMAND** for further proceedings consistent with this opinion.

## I. Background

### A. Trial Proceedings

Petitioner-Appellee Michael Batey (Petitioner) was charged in Allegan County, Michigan, with two counts of first-degree criminal sexual conduct. The charges arose from allegations that Petitioner had engaged in oral and anal sex with his minor nephew Matthew.

As a principal defense, Petitioner planned to assert that he had been framed and that Matthew had actually been molested by his older brother, Jason. Some evidence supported this theory, including the statement of a police officer who interviewed Petitioner that "I know Jason has given

Matt blow jobs before" and a letter from Matthew to Petitioner explaining that the boys' parents knew that Petitioner was aware of Jason sexually abusing Matthew. In a motion *in limine*, the trial court held that Petitioner's exploration of the sexual activity between the brothers was a "fishing expedition" and precluded Petitioner from mentioning it during trial.

Several witnesses testified against Petitioner at trial. Matthew, who had been admitted to a residential psychiatric rehabilitation facility after suffering a nervous breakdown, testified that Petitioner had convinced him to engage in oral sex "at least twenty five times." Matthew also testified that he and Petitioner had anal sex and that Petitioner told him that sexual activity between family members was normal. Jason testified that he, too, had been molested by Petitioner. He also said that he witnessed Petitioner performing oral sex on Matthew at Petitioner's home. The boys' mother and step-father, Sandra Atwood and David Foreman, testified that Jason told them that Petitioner had molested Matthew and that Matthew admitted this was true. The State's expert witness, Dr. Robin Zollar, testified that it was not uncommon for child victims of sexual abuse to suffer mental problems and that a delay in disclosure was normal.

Unable to assert that Atwood and Foreman falsely accused him to cover up Jason's guilt, Petitioner, an open homosexual, claimed that Atwood and Foreman framed him because he was gay. He also asserted they had motive to have him imprisoned because his involvement in their sons' lives was offensive to them. Specifically, he claimed Atwood and Foreman disapproved of the way Petitioner had encouraged Matthew to explore the homosexual feelings he admitted having. He also alleged that his relationship with the boys' parents had been sullied after he helped Matthew seek emancipation from them. Finally, he alleged that Jason was falsely accusing him because he had

tried to rehabilitate Jason from his drug and alcohol problems.

A central component to his defense, Petitioner's homosexuality was brought up early and often at trial. During voir dire, defense counsel asked jurors whether they had any biases toward homosexuals, including whether they had religious objections to homosexuality, and whether they believed "gay men are more likely to be pedophiles." During his opening statement, defense counsel pressed the theory that the animus for Atwood and Foreman framing Petitioner was, at least in part, their prejudice toward his homosexuality. Throughout the course of trial, defense counsel called several of Petitioner's homosexual, former sexual partners to testify on his behalf.

The prosecutor referenced Petitioner's homosexuality multiple times, as well. She asked Atwood if Petitioner being gay bothered her, or whether it disturbed her that Petitioner had encouraged Matthew to discover whether he, too, was a homosexual. Atwood testified that she did not mind that her brother was gay and that she fully supported her son in exploring his own sexual identity. In fact, she testified, she and Foreman had paid the rent on a building where Matthew could attend Petitioner's gay Youth Group meetings. The issue of Petitioner's homosexuality arose in other contexts also. Specifically, the prosecutor asked (1) Jason and Matthew about the names of four of Petitioner's sexual partners, two of whom were witnesses; (2) Jason about a conversation with Petitioner, to which Jason responded over defense counsel's objection that Petitioner told him he "hates girls;" (3) Jason: "Did the defendant ever provide you with any [gay, pornographic] magazines or videos or allow you to see those in his home?;" (4) Petitioner's former sexual partner who testified about a Youth Group meeting whether he was referring to the "gay Youth Group;" (5) whether the same witness was a homosexual; (6) another former sexual partner of Petitioner whether

3

he used or saw any gay pornography at Petitioner's house; and (7) whether the same witness had spoken regarding Petitioner's case to a newspaper called "Michigan's Community News for Lesbians, Gays, Bi-Sexuals and Transgenders and Friends." In her closing argument, the prosecutor addressed Petitioner's theory that his homosexuality motivated Atwood and Foreman to frame him for his nephew's molestation. She summarized the issue by recounting testimony that they provided a building for Matthew to attend Petitioner's gay Youth Group meetings. Finally, she concluded: "This issue isn't about whether defendant is gay or not gay. This isn't about homosexuality, this is about child molestation."

Ironically, during trial, the prosecutor admitted both the transcript containing the officer's statement that Jason and Matthew had engaged in oral sex and Matthew's letter to Petitioner alleging that Jason had molested him. The prosecutor apparently admitted the documents for "expediency's sake" and did not comment on the sexual history between Jason and Matthew alluded to therein. When it came time for closing argument, defense counsel seized the opportunity to comment on the evidence the trial court's earlier ruling had precluded him from admitting:

> [Defense Counsel:] We also heard all kinds of testimony, we heard this back door testimony from their expert, Robin Zollar, who didn't talk to Matthew, just talked to the prosecutor beforehand about this case, and came in and said something like 8% of all males have psychosis because of sexual abuse. I guess what they're trying to show is that Matthew has a psychosis that was brought on by sexual abuse, and it must have been because [Petitioner] did this to him. Of course, when you read the letter, which you'll get a chance to read, what it says here is that Jason said that you knew about him sexually assaulting me before anything was said. That's signed by Matthew. "Dear [Petitioner], Jason said that you knew about him, Jason, sexually assaulting me before anything was said."

The prosecutor interrupted defense counsel's closing argument with an objection. At a sidebar

conference, the trial court sustained the objection and ruled that defense counsel refrain from further comment on the subject of Jason's alleged sexual abuse. When defense counsel recommenced his closing argument, he concluded the subject with the admonition to "read this letter carefully, because they are Matthew's own words. . . I would like you to read that and see what [Matthew] said to [Petitioner]. When you're looking at this letter. . . . remember he testified that this letter was written a month, two weeks, to a month before he went into the hospital."

The jury convicted Petitioner of first-degree criminal sexual conduct on the count of engaging in oral sex with Matthew. He was sentenced to fifteen to forty-five years in prison.

## B. Procedural Background

Petitioner appealed his conviction to the Michigan Court of Appeals. In pertinent part, he claimed that the prosecutor had engaged in misconduct by repeatedly referencing his homosexuality and that the district court's ruling precluding him from commenting on admitted evidence during closing argument deprived him of a fair trial.[1] The Michigan Court of Appeals rejected both arguments.

With respect to Petitioner's prosecutorial misconduct claim, the court found that any misconduct did not affect Petitioner's substantial rights. It held, in pertinent part, that:

> Batey failed to object to all but one of the alleged instances of misconduct. Whether viewed under the de novo standard required for the single preserved instance of alleged misconduct or the plain error standard applicable to the other instances Batey

---

[1] Petitioner raised several additional arguments before the Michigan Court of Appeals. Because the district court predicated habeas relief on Petitioner's prosecutorial misconduct and closing argument claims and did not address the Michigan Court of Appeals' conclusions on the other issues presented, we also need not address them.

brings to our attention, the result is the same: Batey has not demonstrated that the prosecutor's comments were likely to have had any negative effect on the jury. With respect to the comment that drew his objection at trial, the trial court took prompt action to prevent prejudice to him. None of the other comments affected Batey's substantial rights. Singularly or collectively, these comments did not deny Batey a fair and impartial trial.

*People v. Batey*, No. 227117, 2002 WL 1998565, at *5 (Mich. Ct. App. Aug. 27, 2002).

On the issue of Petitioner's closing argument, the Michigan Court of Appeals found that the trial court had erred in restricting defense counsel's comments regarding matters already in evidence. It concluded, however, that the error was harmless:

> Nevertheless, the trial court's error does not require reversal. The jury was aware from the evidence that there was sexual activity between Matthew and Jason. During closing argument, defense counsel told the jury that, in a letter to Batey, Matthew disclosed that Jason had sexually assaulted him. Defense counsel urged the jury to read the letter carefully. Thus, while defense counsel did not have an opportunity to frame the arguments as might have been desired, the jury was still aware of the defense theory. Under these circumstances, it does not affirmatively appear that it is more probable than not that the error was outcome determinative.

*Id*. at *4.

Petitioner filed a motion for leave to appeal the Michigan Court of Appeals' affirmance of his conviction with the Michigan Supreme Court.[2] The Michigan Supreme Court denied leave. Petitioner then filed a writ of habeas corpus in the federal district court for the Eastern District of Michigan, pursuant to 28 U.S.C. § 2254. The district court granted habeas relief on Petitioner's prosecutorial misconduct and closing argument claims. Finding that relief was proper on these

---

[2] The district court thoroughly addressed the various additional filings of the parties' in this case and we hereby incorporate the detailed recitation within its unpublished opinion. *See Batey v. Burt*, No. 05-CV-73699-DT, 2010 WL 2650019 at *2-3 (E.D. Mich. June 30, 2010).

issues, the district court did not address the remaining claims raised in Petitioner's petition. The State appeals.

## II. Analysis

### A. Standard of Review

This Court reviews a district court's decision to grant habeas corpus relief *de novo*. *Tucker v. Palmer*, 541 F.3d 652, 655 (6th Cir. 2008). Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a federal court may not grant a writ of habeas corpus unless the state court decisions "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

### B. Prosecutorial Misconduct Claim

On direct appeal, the Michigan Court of Appeals held that prosecutorial misconduct did not affect Petitioner's substantial rights. Under the deferential AEDPA standard, we will reverse this holding only if we find it contrary to or an unreasonable application of existing federal law.

To sustain a claim of prosecutorial misconduct under AEDPA, Petitioner "must show that any prosecutorial misconduct 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Henley v. Bell*, 487 F.3d 379, 389 (6th Cir. 2007) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). Petitioner points to several of the prosecutor's remarks that he asserts satisfy this standard; notwithstanding, he fails to cite clearly established federal law, as defined by the Supreme Court, that appropriately supports his assertions.

7

While this alone renders further analysis unnecessary, we will nevertheless address the issue raised.

Although the Michigan Court of Appeals did not consider these statements individually, we will do so in order to assess whether its ruling that the statements in the aggregate did not violate Petitioner's substantial rights is subject to reversal under AEDPA. As we find, with an almost *de novo* eye, that the prosecutor's statements were neither individually nor collectively prejudicial to Petitioner, we necessarily conclude that the Michigan Court of Appeals' decision on this issue was not unreasonable.

First, Petitioner urges that it was prosecutorial misconduct for the prosecutor to "pose harassing questions to defense witnesses" and to "remind the jury that [Petitioner] was gay" for "no other purpose than to inflame the jury." He uses the following portions of the prosecutor's cross-examination of defense witness Englemann, Petitioner's former sexual partner, as an example:

> Q: Now, how often have you seen Matthew []?
> . . . .
> A: Four or five [occasions].
> Q: Four or five occasions. How long were those conversations?
> A: Not any certain, you know, length of time that, you know, the Youth Group meetings - -
> . . . .
> Q: Is that the gay Youth Group?
> A: Yes.
> Q: Okay. Were you a member of that group also?
> A: Yes.
> Q: Are you a homosexual?
> A: Yes.
> Q: Are you a friend of the defendant?
> A: Yes.
> . . . .
> Q: Okay. Have you been a partner of Mike's sexually?
> . . . .
> A: Yes, at one time or another.

Considered in context, it is clear the prosecutor was asking legitimate questions to uncover Englemann's bias in favor of Petitioner. Her question about whether the Youth Group to which Englemann was referring was the "gay Youth Group," and whether he was a member of the group, laid the foundation to establish that Englemann was gay like Petitioner. The fact that Englemann was gay, in turn, was necessary to establish that he had engaged in a consensual sexual relationship with Petitioner, a permissible inquiry tending to show that Englemann was disposed to provide testimony that would be favorable to Petitioner. The Supreme Court has consistently held that a witness' bias and partiality is a legitimate subject of cross-examination. *See, e.g., Davis v. Alaska*, 415 U.S. 308, 316 (1974) ("The partiality of a witness is subject to exploration at trial, and is 'always relevant as discrediting the witness and affecting the weight of his testimony.'") (internal citation omitted).

Second, Petitioner contends it was flagrantly improper to question another one of Petitioner's former sexual partners about whether he had used or kept, or knew of Petitioner keeping, gay pornography at Petitioner's home. Although these inquiries seem prejudicial in isolation, Jason testified specifically that Petitioner would "flip [gay, pornographic videos] on and start masturbating. . . . Take off all his clothes and masturbate." In a pre-trial statement, Petitioner denied having gay pornography in his home and indicated that it must have belonged to someone else. In this context, questions regarding the witness' knowledge of gay pornography at Petitioner's residence were relevant and not harassing. Moreover, even the question of the witness' *use* of gay pornography at Petitioner's home was clearly probative given Petitioner's allegation that someone must have left the material behind there.

9

Third, Petitioner argues that the prosecutor wrongfully elicited stereotypical testimony from Jason about Petitioner, including that he "hates girls" and had suffered failed relationships with women:

Q: Did the defendant ever give you any information about homosexuality?
A: Yeah.
Q: How did he provide that to you? What did he tell you?
A: Well, it would end up me telling him about my bad relationships with my girlfriends, then he would get into explaining why he hates girls so much and his problems with girls, then he'd get into the gay issue and he would start pressing it, you know.
Q: Then he would start doing what?
A: Making it out that everything - - that everything in all the - - the gay relationship is better than heterosexual - -
Q: Okay.
A: - - and I was heterosexual and I was getting confused and there for a while I thought that I was gay. I was confused, you know, I'd say I am gay and then I'd change my mind and then I'd think about it and I'd say I'm not gay.
Q: Why did you think you were gay?
A: 'Cause he manipulated me, he had such mind play over me.

Here, again, context is dispositive. Jason's testimony regarding Petitioner saying he "hates girls" and had encountered "problems with girls" supported his allegations that Petitioner manipulated him into believing that the homosexual lifestyle was superior to having heterosexual relationships. This purported manipulation, in turn, explained why Jason believed Petitioner had "mind play" over him when he convinced him to engage in homosexual acts.

Finally, Petitioner alleges that the prosecutor took "great pains" to point out the irrelevant detail that a newspaper to which a defense witness spoke was exclusively for the gay community:

Q: Are you familiar with the newspaper called Between the Lines?
A: Yes, I am.
Q: And, that's a newspaper published in Michigan. Is that correct?
A: Yes, it is.

10

> Q: It's called a Michigan's Community News for Lesbians, Gays, Bi-Sexuals and Transgenders and Friends. Sorry.
> A: Yes.

The record reflects that this exchange took place in the course of the prosecutor's attempt to impeach the defense witness. The prosecutor took no more "pains" to point out the title of the newspaper to which the witness spoke than to clarify what he said in his conversation and on what date the conversation occurred. It is inconsistent for Petitioner to now claim that the mere mention of a homosexual publication is prejudicial where Petitioner himself chose to make homosexuality a cornerstone of his own defense.

Petitioner is correct that his homosexuality was a main focus at trial. But this was because either Petitioner himself asserted it as a principal defense, or because Petitioner's discussions of homosexuality and his possession of homoerotic materials were material components of the State's case. Similarly, it was Petitioner himself who most often raised the issue of defense witness' homosexuality. The prosecutor reiterated it only as necessary to show bias. Accordingly, whether the prosecutor's statement are assessed individually, as here, or collectively, as by the Michigan Court of Appeals, we find no ground on which the Michigan Court of Appeals' conclusion that Petitioner's substantial rights were unaffected by prosecutorial misconduct warrants reversal under AEDPA.

### C. Closing Argument Claim

The Michigan Court of Appeals found that the trial court erred when it prevented defense counsel from commenting on matters in evidence during its closing argument. In consideration of the fact that the State's own admission apprised the jury of the very information defense counsel

sought to discuss, however, it found the error harmless.   Under AEDPA, we reverse this finding only if we conclude that the Michigan Court of Appeals' decision was contrary to or an unreasonable application of federal law, as defined by the Supreme Court.

The Supreme Court has held that the right of a criminal defendant to present closing argument is derivative of the Sixth Amendment right to counsel and the right to present a defense, and "is a basic element of the adversary factfinding process in a criminal trial." *Herring v. New York*, 422 U.S. 853, 858 (1975).  To this end, while the trial court has discretion to "ensure that argument does not stray unduly from the mark, or otherwise impede the fair and orderly conduct of the trial," *id*. at 862, it may not fully curtail the defendant's right "to be heard in summation of the evidence from the point of view most favorable to him." *Id*. at 864.

The State does not dispute that the trial court's closing argument ruling was error but urges us to conclude, like the Michigan Court of Appeals, that the error was harmless.  An ordinary trial error is harmless if the reviewing court finds that it did not have "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

We agree that any error in this case was harmless under *Brecht*.  By virtue of the prosecutor's earlier admissions, the jury had access to evidence that Jason had sexually abused Matthew in the past.  Furthermore, defense counsel was able to read aloud the most damaging portions of this evidence before the prosecutor objected.  In fact, defense counsel was able to fully argue that Dr. Zollar's testimony merely established that Matthew had been a victim of sexual molestation and that the jury could ultimately infer that Jason, not Petitioner, was the perpetrator of that abuse.  Although

12

the trial court sustained the prosecutor's objection, it never instructed the jury to disregard defense counsel's comments. Finally, defense counsel was able to conclude his closing argument remarks on the subject, without objection, by encouraging the jury to reference Matthew's letter for itself. We are confident that this directive, coupled with the aforementioned factors, ameliorated any prejudice caused by the trial court's ruling.[3] As the Michigan Court of Appeals reached the same conclusion, we find that its decision was not contrary to or an unreasonable application of clearly established federal law.

The district court relied on *Conde v. Henry*, 198 F.3d 734 (9th Cir. 1999) to support its conclusion that the Michigan Court of Appeals' decision failed under AEDPA. The district court's reliance on *Conde* was misplaced for two reasons. First, *Conde* is a Ninth Circuit case and is thus not "clearly established federal law *as determined by the Supreme Court*." *See* 28 U.S.C. § 2254(d)(1). Second, *Conde* is factually distinguishable. In that case, the Ninth Circuit found habeas relief appropriate for the trial court's structural error of preventing defense counsel from arguing to the jury that the defendant, on trial for kidnaping for the purposes of robbery, had no intent to commit robbery. *Conde*, 198 F.3d at 739. Thus, the trial court's ruling in *Conde* effectively prevented the defendant from contesting an element of the crime with which he was charged. *Id*. This is not the case here, where the maximum effect of the trial court's ruling was to merely

---

[3] We are also persuaded by the State's argument that additional elaboration on Jason's alleged abuse may not have been as exculpatory as expected. Indeed, the unusual nature of biological brothers engaging in sexual acts with one another may have corroborated, rather than undermined, Matthew's testimony that Petitioner told him that sexual activity between family members was normal.

13

abbreviate one of many of Petitioner's arguments supporting his complete innocence.

### III. Conclusion

For the reasons stated, we **REVERSE** the district court's grant of habeas relief on the basis of prosecutorial misconduct and Petitioner's closing argument claim. We **REMAND** for the district court to consider whether habeas relief is warranted on the other, previously unconsidered claims raised in Petitioner's habeas petition, including the threshold issue of whether these claims have been appropriately preserved.